672 F.2d 469
 1982-1 Trade Cases 64,659
 UNITED STATES of America, Plaintiff-Appellee,
v.
SOUTHERN MOTOR CARRIERS RATE CONFERENCE, INC. and North
Carolina Motor Carriers Association, Inc.,
Defendants-Appellants,
National Association of Regulatory Utility Commissioners,
Intervenor-Appellant.
 No. 79-3741.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B*
 April 5, 1982.
 Arnall, Golden & Gregory, Allen I. Hirsch, Simon A. Miller, Jeffrey C. Baxter, Atlanta, Ga., for Southern Motor Carriers.
 Rea, Cross & Auchincloss, Bryce Rea, Jr., David Hyler Coburn, Washington, D.C., for North Carolina Motor and amicus Nat. Motor Freight Traffic Assoc.
 Robert P. Gruber, Gen. Counsel, Wilson B. Partin, Jr., Deputy Gen. Counsel, David Gordon, Associate Atty. Gen., Raleigh, N.C., for amicus curiae.
 Barry Grossman, Atty., Nancy C. Garrison, Robert Lewis Thompson, Antitrust Div., Appellate Section, Dept. of Justice, Washington, D.C., for plaintiff-appellee.
 Paul Rodgers, Gen. Counsel, Charles D. Gray and Pamela R. Melton, Washington, D.C., for intervenor-appellant.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before HILL and FRANK M. JOHNSON, Jr., Circuit Judges and SCOTT**, District Judge.
 FRANK M. JOHNSON, Jr., Circuit Judge:
 
 
 1
 In 1976 the United States instituted this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, to enjoin the continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by three rate bureaus. These defendants, Southern Motor Carriers Rate Conference, Inc. (SMCRC), North Carolina Motor Carriers Association, Inc. (NCMCA), and Motor Carriers Traffic Association, Inc. (MCTA), represent common carriers before the regulatory commissions of the states of Alabama, Georgia, Mississippi, North Carolina, and Tennessee. These rate bureaus perform three basic functions: (1) they provide a forum for competing member carriers to discuss and agree on rates for intrastate transportation of general commodities to be proposed to state public service commissions for approval; (2) they publish tariffs and supplements containing the rates on which the carriers agree; and (3) they provide counsel, staff experts, and facilities for the preparation of cost studies and other exhibits and testimony for use in support of proposed rates at hearings held by the regulatory commissions.[1] The government challenged the first of these functions as price fixing in violation of Section 1 of the Sherman Act.[2]
 
 
 2
 Deciding the case on cross-motions for summary judgment, the district court held defendants in violation of Section 1 and granted the government's motion. In so doing, the judge rejected defendants' arguments that their activities were immune under the state action doctrine or under the Noerr-Pennington doctrine and that their activities did not constitute an antitrust violation.
 
 
 3
 Two of the defendants, SMCRC and NCMCA, and the intervenor, The National Association of Regulatory Utility Commissioners, have filed this appeal. We affirm.
 
 State Action Immunity
 
 4
 Appellants vigorously argue that their collective ratemaking falls within the "state action" exception to the antitrust laws. The Supreme Court first clearly articulated this exception in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). At issue in Parker, a suit against state officials, was an agricultural proration system established by a state statute authorizing a commission to impose marketing programs for raisins after petition by raisin growers and imposing penalties for failure to follow the programs. Federal antitrust law, the Court held, did not prohibit this system, for the Sherman Act was not intended to alter a state's action supplanting competition. The program at issue, established by "state command", was adopted and enforced by the state acting as sovereign. See id. at 352, 63 S.Ct. at 314. The Court explicitly noted that a state's mere authorization of parties to violate the Sherman Act or a state's participation with private parties in an agreement in restraint of trade would not insulate actions from the federal antitrust laws. Id. at 351, 63 S.Ct. at 313.
 
 
 5
 The particular issue regarding the state action exception that is crucial here is whether a private party may avail itself of the exception only if the state compels it to perform the disputed actions. Appellants assert that in California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Supreme Court eliminated any state compulsion prerequisite for private party invocation of the exception. We disagree with that assertion. Before we address the holding of Midcal itself, however, we believe that it would be worthwhile to elaborate on certain aspects of the exception that the Supreme Court has announced in cases since Parker that interpret what constitutes an act of the state as sovereign.
 
 
 6
 First, we believe that in cases prior to Midcal the Supreme Court has made clear that private parties can invoke the state action exception only if the state compels their actions.[3] In Goldfarb v. Virginia State Bar Ass'n, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Court struck down a minimum fee schedule the habitual violation of which would, according to the state bar association, raise a presumption of unethical conduct. Noting that the bar association was not a state agency for the purposes at issue, the Court asserted that "(t)he threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is required by the state acting as sovereign." Id. at 790, 95 S.Ct. at 2014. Similarly, in Bates v. State Bar of Arizona, 433 U.S. 350, 359-60, 97 S.Ct. 2691, 2696-97, 53 L.Ed.2d 810 (1977), the Court, though striking down a ban on lawyer advertising on First Amendment grounds, distinguished Goldfarb by finding that the challenged restraint was the "affirmative command" of the Arizona Supreme Court, the body wielding the state's power over the practice of law, and so was " 'compelled by direction of the State as sovereign.' " Id. at 360, 97 S.Ct. at 2697 (quoting Goldfarb, 421 U.S. at 791, 95 S.Ct. at 2015). See also Litton Sys., Inc. v. Southwestern Bell Tel. Co., 539 F.2d 418, 423 (5th Cir. 1976).
 
 
 7
 Second, the Supreme Court has not required that the state compel action of public institutions. In Parker, the state did not require a state commission to issue a mandatory program. Rather, it gave the commission the option of establishing the program after the petition of raisin growers. In Bates the Court specifically noted that its analysis differs substantially depending on whether the defendant is a public or private official or institution. See also Community Communications Co. v. City of Boulder, --- U.S. ----, ----, 102 S.Ct. 835, 840, 70 L.Ed.2d 810 (1982) (suggesting mere state "sanction" of municipal action sufficient for invoking exception); Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 410 n.40, 98 S.Ct. 1123, 1135 n.40, 55 L.Ed.2d 364 (1978) (plurality opinion) (same).
 
 
 8
 Third, an action purporting to be by the state as sovereign must further a clear state policy. The Supreme Court explored this requirement, which for private parties is in addition to the threshold state compulsion requirement, in Cantor v. Detroit Edison Co., 428 U.S. 579, 592-98, 96 S.Ct. 3110, 3118-21, 49 L.Ed.2d 1141 (1976). At issue was a program of the Detroit Edison Co., a private defendant, approved by a state commission. Under the program, the company provided light bulbs without a charge separate from a customer's billings for electricity. The Court held that the program was not state action immune from the Sherman Act's purview. The Court found no necessary conflict between the state's regulation of the distribution of electricity and the federal interest in the competitive market for light bulbs. Moreover, noting that it would not find an exception unless required for the state regulatory program to function and then only to the minimum extent necessary, the Court found that Michigan's policy interest in regulating electricity would not be affected by the inapplicability of the state action exception to the free light bulb program.[4] This consideration is equally applicable in suits against public defendants. In Bates, the Court, stating that for the purposes at issue the state bar was an agent of the state in enforcing a ban on advertising, specifically held Cantor inapplicable because "the regulation of the activities of the bar is at the core of the State's power to protect the public", 433 U.S. at 361, 97 S.Ct. at 2697, and the state policy was "clearly and affirmatively expressed". Id. at 362, 97 S.Ct. at 2698. See also New Motor Vehicle Bd. v. Orrin W. Fox Co., 439 U.S. 96, 109, 99 S.Ct. 403, 411, 58 L.Ed.2d 361 (1978); City of Lafayette, 435 U.S. at 410, 98 S.Ct. at 1135 (plurality opinion).
 
 
 9
 Keeping in mind the three considerations present in the Supreme Court cases outlined above-the need for state compulsion of private defendants, for some lesser state directive for public defendants, and for a clear expression of state policy-we proceed to an analysis of Midcal itself. The statute at issue in Midcal required wine producers and wholesalers to file fair trade contracts or price schedules with the state. Wholesalers could not resell wine to retailers at prices below those on the contracts or schedules. The Supreme Court reviewed prior cases on state action immunity and held that they established a two-pronged standard. "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." 445 U.S. at 105, 100 S.Ct. at 943 (quoting City of Lafayette, 435 U.S. at 410, 98 S.Ct. at 1135 (plurality opinion)). California's regulatory system, the Court ruled, met the first prong but not the second; it therefore did not grant immunity from the antitrust laws.
 
 
 10
 At issue in this case is the meaning of the first prong of the standard.[5] We believe that this first prong of the Midcal standard did announce a broad, general standard for applying the state action exception, but that it merely is a general restatement incorporating earlier holdings that considered the exception as applied both to public and private defendants and with regard both to the need for state compulsion and for a clear articulation of state policy. By providing this broad overview the Court did not intend to alter the applicability of the exception in the particular contexts that the earlier cases had considered. In particular, the Court did not eliminate the requirement that the state compel action by private parties.
 
 
 11
 The correctness of our interpretation is evident on examination of the Court's opinion. First, there is not the slightest hint in Midcal that the Court no longer agreed with its earlier holdings. To the contrary, the Court cited those holdings with approval, even quoting Goldfarb's statement that "(i)t is not enough that ... anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as sovereign." 445 U.S. at 104, 100 S.Ct. at 942 (quoting 421 U.S. at 791, 95 S.Ct. at 2015). Indeed, the Court explicitly stated that its earlier decisions established the standards announced in Midcal.[6] 445 U.S. at 105, 100 S.Ct. at 943. Second, the language the Court used to announce its standard, "clearly articulated and affirmatively expressed state policy", does not imply a departure from a compulsion requirement. Given the articulation of a general standard, there is no oddity in not mentioning in text the need for state compulsion in one particular application of the standard.[7] Moreover, in the context of private parties, we cannot see how there ever could be a clearly articulated and affirmatively expressed state policy in any case in which the state allows an individual to choose at his whimsy the option of doing or not doing some act. Finally, the Court has in earlier cases used language similar or identical to that adopted in Midcal. See New Motor Vehicle Bd., 439 U.S. at 109, 99 S.Ct. at 411; City of Lafayette, 435 U.S. at 410, 98 S.Ct. at 1135 (plurality opinion) (quoted in Midcal's articulation of its standard); Bates, 433 U.S. at 362, 97 S.Ct. at 2684. If the use of such language in earlier cases did not alter the state compulsion requirement, there is no reason to interpret the language in Midcal as altering the requirement.[8]
 
 
 12
 Having determined that the state compulsion requirement remains an element essential to private party invocation of the state action exception, we must resolve whether the state regulatory programs at issue compel joint rate formulation. North Carolina General Statute § 62-152.1(b) states that in order to realize and effectuate the policy of uniform rates among carriers, any party to an agreement with other carriers regarding uniform rates may apply to a state commission for approval of the agreement; Section 62-152.1(h) relieves parties to an agreement so approved from the operation of the antitrust laws. The statute does no more than authorize or permit collective ratemaking. There is no compulsion. Tennessee Public Service Commission Rule 1220-2-1.40 adopts Section 5a of the Interstate Commerce Act, 49 U.S.C.A. § 10706(b), which permits carriers to file joint rates and exempts those who do file such rates from the antitrust laws. In addition, Tenn.Code Ann. § 65-1506 permits the Public Service Commission to establish joint ratemaking procedures.[9] Again, there is no state compulsion. Georgia Code Ann. § 68-613, which requires a state commission to "establish ratemaking procedures for all motor common carriers, which procedure shall include, but not be limited to, collective ratemaking procedures", explicitly indicates that Georgia intends to give carriers the option of filing rates jointly or individually.[10] A 1942 order of the Alabama Public Service Commission requires carriers to "prepare, publish and file with the Commission an individual tariff or ... participate in an agency issue." Record at 53. As with Georgia, Alabama explicitly permits individual rate applications. Finally, Mississippi in Miss.Code Ann. §§ 77-7-1 to -341 merely contemplates cooperation among carriers to the limited extent of establishing "joint rates."[11] This falls short of compelling joint applications for proposed rates. Having found that no state, the laws or regulations of which are at issue here, compels private parties to make joint ratemaking applications, we find the state action exception inapplicable.[12]
 
 Noerr-Pennington Doctrine
 
 13
 Appellants next assert that, under the Noerr-Pennington doctrine,[13] antitrust sanctions may not be applied against them because their collective activities consist solely of protected attempts to influence public officials. We agree with the district judge's rejection of this argument and adopt in part the rationale of that court.
 
 
 14
 The government answers that the complaint charges three distinct types of activity: (1) coordinating and fixing of rates; (2) presenting the collectively set rates to the state commissions; and (3) putting the rates into effect, ostensibly pursuant to state sanction. Implicitly conceding that the second activity is protected, the government contends that the first may be treated separately, and must itself give rise to antitrust liability.
 
 
 15
 This case is not technically one to which Noerr-Pennington has traditionally been applied. Noerr and its progeny have all involved concerted attempts to obtain governmental interference with a competitor. The parties have cited no cases in which courts have invoked Noerr-Pennington to immunize price fixing among competitors.
 
 
 16
 467 F.Supp. at 484-85 (citation omitted).
 
 
 17
 Indeed the Court's discussion in the Noerr case itself lends support to the trial court's conclusion "that the defendants' activities of collective rate formulation constitute independently cognizable acts outside the scope of First Amendment protection or the Noerr-Pennington doctrine." Id. at 485. In Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Court pointed to the "essential dissimilarity between an agreement jointly to seek legislation or law enforcement and the agreements traditionally condemned by § 1 of the Act," such as combinations in which the participants "jointly give up their trade freedom, or help one another to take away the trade freedom of others through the use of such devices as price fixing agreements." Id. at 136, 81 S.Ct. at 528.[14] Moreover, the kind of collective action at issue here seems at odds with the thrust of the Noerr-Pennington doctrine, which assures public access to the channels of government policymaking. While the joint efforts of the bureaus to secure legislation or commission regulation permitting collective ratemaking procedures would clearly fall within the ambit of Noerr protection, inasmuch as it would seek to influence policy, collective action to determine the rates which the bureaus desire the commission to approve is not of the same genre.
 
 The Sherman Act Violation
 
 18
 Having found appellants not to be beyond the ambit of the Sherman Act, we must address directly whether their actions are violations of Section 1 of that Act. Appellants present two arguments: (1) that the practice of collective rate formulation does not constitute price fixing because the states, rather than the carriers, ultimately determine the rates to be charged; and (2) that the bureaus' activities must be evaluated under a rule of reason analysis, which dictates a finding that the bureaus did not unreasonably restrain trade.
 
 
 19
 As the district court observed, the power of the states, through their public service commissions, to review the reasonableness of proposed rates does not alter the essential anticompetitive nature and effect of a horizontal agreement among competitors regarding rates to be charged. In Georgia v. Pennsylvania Railroad Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), the Supreme Court held that a combination among regulated railroads to fix rates stated a claim for price fixing under Section 1 of the Sherman Act, even though the Interstate Commerce Commission reviewed and approved proposed rates. The Court explicitly rejected the argument urged here by the rate bureaus.
 
 
 20
 The fact that the rates which have been fixed may or may not be held unlawful by the Commission is immaterial to the issue before us.... (E)ven a combination to fix reasonable and non-discriminatory rates may be illegal.... The reason is that the Interstate Commerce Act does not provide remedies for the correction of all the abuses of rate-making which might constitute violations of the anti-trust laws.
 
 
 21
 Id. at 460, 65 S.Ct. at 727 (citation omitted).[15] Moreover, both the Reed-Bullwinkle Act, 49 U.S.C. § 10706, at the interstate level and the state statutes extending state antitrust immunity to collective ratemaking at the intrastate level are premised on the recognition that, absent such immunity, this activity would contravene antitrust prohibitions on price fixing.[16]
 
 
 22
 Thus we agree with the district court that "the practice of collective rate publication easily fits the classic description of a 'naked price restraint.' " 467 F.Supp. at 486. Collective formulation clearly tampers with the price structure for intrastate transportation of general commodities; the rate bureau arrangement substitutes concerted pricing decisions among competing carriers for the influence of impersonal market forces on proposed rates. Such combinations traditionally have been condemned as illegal per se. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). It is irrelevant that, as the bureaus argue, the state regulatory commissions' ultimate authority to determine which intrastate rates become effective deprives the bureaus of any real power directly to fix prices at a particular level. It is sufficient for Sherman Act liability if the purpose or the effect of the combination is that of "raising, depressing, fixing, pegging, or stabilizing the price." Id. at 223, 60 S.Ct. at 844. Here the rate bureaus cannot disclaim any purpose to inhibit competition among their member carriers in the fixing of proposed rates for the same service. Moreover, the effect of joint ratesetting is to reduce the amount of independent rate filing that otherwise would characterize the market process.
 
 
 23
 The appellants nevertheless argue that their conduct must be evaluated under a rule of reason analysis. We disagree. The bureaus' reliance on Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979),[17] in support of a rule of reason approach is misplaced. In Broadcast Music the Supreme Court refused to condemn the issuance of blanket licenses to copyrighted musical compositions by the American Society of Composers, Authors and Publishers (ASCAP) and Broadcast Music, Inc. (BMI) at fees negotiated by ASCAP and BMI as a form of price fixing per se illegal under the Sherman Act.[18] Influencing the Court's adoption of a rule of reason approach was its determination that the licensing scheme achieved purposes unrelated to price formation. The same cannot be said of the practice of collective rate formulation.
 
 
 24
 In Broadcast Music the Court reasoned: "The blanket license, as we see it, is not a 'naked restraint of trade with no purpose except stifling of competition,' ... but rather accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright use." Id. at 20, 99 S.Ct. at 1562 (citations omitted). Because of the virtual impossibility of engaging in thousands of individual negotiations for the performing rights to copyrighted compositions, and the difficulty, from the user's perspective, of reporting uses and, from the copyright owner's perspective, of policing unauthorized performances, the blanket license arose as a practical necessity in the market for performing rights. It gave users unlimited access to BMI and ASCAP's repertory of copyrighted works and gave the owners reliable protection against infringement. Id. at 20-21, 99 S.Ct. at 1562-63. Thus, the blanket licensing scheme created a forum for linking buyers and sellers-i.e., users and owners-and yielded improvements in the market for performing rights of copyrighted compositions which were unrelated to price. In contrast, the practice of joint formulation creates no market for trucking services that would not exist if individual carriers formulated their own proposed tariffs. The effect of the practice, if it has any at all, can only be on price formation. See generally L. Sullivan, Handbook of the Law of Antitrust § 59, p. 154, § 74 pp. 200-02 (1977).[19] The economic advantages to the member carriers[20] cannot justify the inhibiting effect on price competition. See id. § 24, p. 203. Nor can the elimination of so-called destructive competitive practices justify it. Socony, 310 U.S. at 220-21, 60 S.Ct. at 842-43. Arguments based on economic efficiencies essentially resolve themselves into the contention that concerted decisionmaking rather than competition is preferable. See L. Sullivan, supra, § 74, p. 202. The policy of the Sherman Act is to the contrary.[21]
 
 
 25
 Appellants also urge consideration of the regulatory context of this case as sufficient reason to invoke a rule of reason analysis. Indeed, we have acknowledged that "consideration of federal and state regulation is proper in certain instances even after the issue of antitrust immunity has been resolved." Mid-Texas Communications Systems, Inc. v. American Telephone and Telegraph Co., 615 F.2d 1372, 1385 (5th Cir.), cert. denied, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980) (citing United States v. Marine Bancorporation, Inc., 418 U.S. 602, 627, 94 S.Ct. 2856, 2872, 41 L.Ed.2d 978 (1975), and Silver v. New York Stock Exchange, 373 U.S. 341, 360-61, 83 S.Ct. 1246, 1258-59, 10 L.Ed.2d 389 (1963)) (emphasis added). We are convinced, however, that this is not one of those instances in which the fact of state regulation determines the standard by which we measure the anticompetitive effect of the challenged conduct and thus the ultimate issue of liability.
 
 
 26
 In declining to do so, we cannot be accused of being "so inflexible as to deny consideration of governmental regulation." Id. At every turn appellants have urged us to consider the impact of state regulation on the trucking industry-its impact on the availability of immunity, on the characterization of their conduct, and on the standard for measuring liability. We believe that on the facts of this case any deference to the impact of state regulation is appropriate only in determining whether the challenged conduct is immune under the state action doctrine.
 
 
 27
 We perceive appellants' arguments on the liability issue to have three possible, somewhat overlapping, connotations: that the impact of state regulation deserves consideration (1) because regulation is just another fact of market life to which they have responded, (2) because a state interest is at stake in the challenged conduct, or (3) because it is unfair to penalize action which is merely a response to state regulatory interests.
 
 
 28
 With respect to the first reason, treating state regulation as a fact of market life may be quite proper if regulation precludes the existence of factual predicates upon which antitrust liability hinges. Such was our concern in Mid-Texas Communications, in which we directed assessment on remand of the effect of regulation on the defendant's power to exclude competition in the relevant market (i.e., on whether the defendant possessed monopoly power) and on defendant's alleged willful misuse of its monopoly power. 615 F.2d at 1386-90. Both the possession of monopoly power and its willful misuse are necessary to sustain a charge of illegal monopolization under Section 2 of the Sherman Act. Id. at 1385-86. In the context of price fixing allegations, however, the antitrust focus is not on market power, but on the purpose or effect of the combination. Socony, 310 U.S. at 221, 60 S.Ct. at 843. See L. Sullivan, supra, § 70, p. 192. Moreover, in cases in which courts have regarded the impact of regulation on predicates to liability, the courts did not alter the standard for measuring liability, as appellants here urge us to do. See Mid-Texas Communications Systems, Inc. v. American Telephone and Telegraph Company, 615 F.2d 1372 (5th Cir.), cert. denied, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980); International Telephone & Telegraph Corp. v. General Telephone and Electronics Corp., 518 F.2d 913, 935-36 (9th Cir. 1975) ("(T)he fact of regulation is significant, but not because it embodies a doctrinal scheme different from the antitrust law; the sole legal perspective is that afforded by the antitrust law.").
 
 
 29
 As for the second reason-the presence of a state interest in the challenged conduct-the state action doctrine is designed to vindicate that interest. Indeed, deference to the state interest and the sovereignty of the state is at the heart of that doctrine. Accordingly, we have considered above the impact of state regulation and have found no immunity. Deference to the state's interest should not be broadened to the extent that every antitrust concept, including the measure of liability, must accommodate the state's interests.
 
 
 30
 Finally, with respect to the fairness argument, we recognize that injustice may be done by allowing damage relief against a private defendant whose activity is a legitimate response to state legislation or regulation. Because the government has sought only injunctive relief against the appellants, this concern need not detain us. In addition, such fairness considerations apply more properly to the questions of immunity from liability[22] and the shaping of appropriate remedies and should not sway us to alter the standard of liability.
 
 
 31
 Accordingly, for the reasons stated the judgment of the district court is AFFIRMED.
 
 HILL, Circuit Judge, dissenting:
 
 32
 I respectfully dissent from the majority's resolution of the issue of state action immunity. In evaluating the effect of California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), on this case, I am persuaded that it establishes a standard different from that applied by the district court[1] and that the majority has misinterpreted the Midcal standard. I would therefore reverse and remand in part for further consideration.
 
 
 33
 The central issue in this case-whether the practice of collective rate formulation employed by the rate bureaus is immune from antitrust attack under the state action doctrine-is one beset with difficulties. Of state action immunity it is well said that "(u)nlike many other phantasmagoria of the law, we know it is there, but it is hard to define precisely what it is, and, unlike obscenity, we do not always know it even when we see it." Kennedy, Of Lawyers, Lightbulbs, and Raisins: An Analysis of the State Action Doctrine Under the Antitrust Laws, 74 Nw.U.L.Rev. 31, 31 (1979). Moreover, the Supreme Court's decision in Midcal has not removed all the uncertainties in this area, for the parties dispute both the meaning and the application of the standards set forth in Midcal. Finally, sensitive policy considerations influence the choices to be made. On the one hand there is the strong policy in favor of competition that underlies the federal antitrust laws. On the other are the right of the states to engage in economic regulation and all the federalism implications which the potential conflict between state and federal regulation may generate.
 
 
 34
 In Midcal, after reviewing the line of cases following Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court set forth two standards for determining when the state's involvement is sufficient to justify immunity of the challenged conduct. "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." 445 U.S. at 105, 100 S.Ct. at 943 (quoting City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978) (opinion of Brennan, J.)). Thus, whether the defendant be a state or state instrumentality or a private party,[2] Midcal directs that the focus for immunity purposes must be upon the extent of the state's involvement in the challenged restraint-that is, upon the kind of imprint of state authority the anti-competitive activity bears.
 
 
 35
 Midcal examines the extent of the state's involvement at two levels-first, at the level of articulation of a state policy in favor of the challenged restraint and second, at the level of implementation of that policy through active supervision. Significant state involvement at both levels is necessary to justify exemption of the anticompetitive conduct under the state action doctrine. Hence the balance that the Supreme Court has struck between the federal policy of competition and the states' sovereignty is this: the state may choose to displace competition with economic regulation by making clear its intention to do so; once it has made that choice, however, the state bears the burden of ensuring that this policy is furthered and that it remains the ultimate decisionmaker.[3]
 
 
 36
 In testing the actions of private parties under Midcal standards, I am convinced that state compulsion of the private activity, as set forth in Goldfarb, is not a sine qua non for clothing private conduct with state action immunity. It is on this point that the majority and I differ. To state the point more plainly, state compulsion is not the only way to satisfy the first prong of the Midcal test; such compulsion is merely the best evidence that the challenged restraint is a "clearly articulated and affirmatively expressed" state policy.
 
 
 37
 Support for this interpretation of Midcal may be found in the language of that opinion. The resale price maintenance scheme established by the California statute required of wine wholesalers, on pain of fines or of license suspension or revocation, adherence to the pricing scheme. 445 U.S. at 100, 100 S.Ct. at 940. In concluding that the first prong of the Midcal test had been satisfied, however, the Court did not track the Goldfarb language and reason that the first prong was met because the state "compelled" resale price maintenance. It chose instead to say: "The legislative policy is forthrightly stated and clear in its purpose to permit resale price maintenance." Id. at 105, 100 S.Ct. at 943 (emphasis added).
 
 
 38
 Moreover, I believe that the function served by the Goldfarb compulsion requirement is served as well by the Midcal formulation. Where private parties are involved to any extent in the state's scheme of economic regulation, there is properly a concern that the economic self-interest of those parties may infect the decisionmaking process and result in harmful anticompetitive activity. Such private self-interest does not warrant the cloak of state action immunity. By requiring that a state actively supervise the implementation of its economic policy, the Midcal test ensures that the state has determined that the challenged activity is in furtherance of the state's policy. Hence the second prong of Midcal addresses the concern in Goldfarb by ensuring that the state does not abdicate its responsibility to private parties.[4] When the state ceases to be the real party in interest by abandoning control over a segment of its economy to private parties, the sovereignty of the state cannot be said to be impaired by withholding state action immunity.[5] Thus the Midcal test preserves to the states the freedom to pursue state regulatory policies free of antitrust sanctions without at the same time permitting the purely economic self-interest of private parties to disrupt the forces of competition.
 
 
 39
 Finally, Professor Areeda's views are in accord with the interpretation I have placed on Midcal 's effect on the Goldfarb compulsion requirement. In discussing the Goldfarb and Cantor cases, Areeda has commented:
 
 
 40
 Compulsion ... should not be read as an independent requirement for state action immunity; rather, its presence or absence should serve only as strong evidence about state intent. Admittedly, however, some doctrinal confusion exists on this point.
 
 
 41
 ....
 
 
 42
 The Supreme Court and lower courts have not applied the compulsion language literally. In Midcal ...., the Court defined the criteria for immunity not in terms of compulsion but in terms of supervision and articulated state policy; the emphasis on supervision implies public scrutiny, deliberation, and review, but not command.
 
 
 43
 Areeda, Antitrust Immunity for "State Action" After Lafayette, 95 Harv.L.Rev. 435, 438 & n.19 (1981) (citation omitted) (emphasis added). He went on to explain the result in Goldfarb and Cantor (no immunity) as hinging not on absence of compulsion but on absence of meaningful state participation in the challenged conduct. Id. n.19.
 
 
 44
 In applying the Midcal test as I understand it to the facts of this case, I think it clear that at least the states of North Carolina, Tennessee, and Georgia have policies favoring collective rate formulation by the rate bureaus.[6] As to the remaining states, I would remand the case to the district court for further development of the factual record and for evaluation under the Midcal test.
 
 
 45
 By legislative enactment the state of North Carolina has clearly endorsed collective rate formulation as a means for achieving the goals of its public service commission. Section 62-152.1(b) of the North Carolina General Statutes provides:
 
 
 46
 For the purpose of achieving a stable rate structure it shall be the policy of this State to fix uniform rates for the same or similar services by carriers of the same class. In order to realize and effectuate this policy and regulatory goal any carrier subject to regulation by this commission and party to an agreement between or among two or more carriers relating to rates, fares, classifications, divisions, allowances or charges ... or rules and regulations pertaining thereto, or procedures for the joint consideration, initiation or establishment thereof, may under such rules and regulations as the commission may prescribe, apply to the commission for approval of the agreement ....
 
 
 47
 The effect of such commission approval is set out in section 62-152.1(h).
 
 
 48
 Parties to any agreement approved by the commission under this section and other parties are ... hereby relieved from the operation of the antitrust laws with respect to the making of such agreement, and with respect to the carrying out of such agreement in conformity with the terms and conditions prescribed by the commission.
 
 
 49
 These North Carolina provisions parallel the provisions of the Interstate Commerce Act which exempt from federal antitrust laws agreements concerning collective ratemaking among motor carriers operating in interstate commerce. Moreover, they unmistakably indicate that collective rate formulation is part of the regulatory policy of the state of North Carolina. I would therefore hold the joint ratemaking activities of the rate bureaus in that state immune.
 
 
 50
 Likewise, I would hold the activities of the appellants in Tennessee immune under the state action doctrine. By express commission regulation Tennessee has made clear its intention to permit and encourage collective rate formulation. Rule 1220-2-1-.40 of the Tennessee Public Service Commission states:
 
 
 51
 The rules and regulations governing the agreements between or among two or more carriers relating to rates, fares, classifications, divisions, allowances, or charges (including charges between carriers and compensation paid or received for the use of facilities or equipment), or rules and regulations pertaining thereto, or procedures for the joint consideration, initiation or establishment thereof as set forth by the Interstate Commerce Commission in § 5a of the Interstate Commerce Act (now codified as 49 U.S.C. § 10706(b) ), are hereby adopted by the Tennessee Public Service Commission; provided, however, that the final determination on any rates, fares, classifications, divisions, allowances, charges, rules and regulations or procedure shall be left in its final determination to the Tennessee Public Service Commission.
 
 
 52
 In addition, Tennessee has reiterated its policy in favor of collective action by the carriers by a 1980 amendment to its Motor Carrier Act which vests the Tennessee Public Service Commission with power to establish collective ratemaking procedures. Tenn.Code Ann. § 65-1506 (Cum.Supp.1981). All carriers who are party to a collective ratemaking agreement must comply with these procedures.
 
 
 53
 With respect to Georgia, that state has recently amended its Motor Common Carrier Act of 1931 to require its public service commission to "establish ratemaking procedures for all motor common carriers, which procedure shall include, but not be limited to, collective ratemaking procedures for the joint consideration, initiation and establishment of such rates and charges." Ga.Code Ann. § 68-613 (Cum.Supp.1981). All motor common carriers subject to the commission's authority are "required to comply with such ratemaking procedures." Id. This legislative pronouncement convinces me that state action immunity would be available to the appellants' activities in Georgia.
 
 
 54
 The state of Alabama presents a more difficult question. In the proceedings in the district court, Alabama referred to a 1942 order of its public service commission as evidence that collective rate formulation is a clearly articulated and affirmatively expressed state policy. On April 20, 1942, the Alabama Public Service Commission ordered that certain motor carriers "prepare, publish and file with the Commission an individual tariff, or ... participate in an agency issue." Record at 53. It is unclear whether "agency issue" indicates that carriers may publish their tariff through an agent or that carriers may jointly formulate the rates to be proposed in their tariffs. The term is not defined in the record. I would therefore remand to the district court for further development of the record to determine whether the rules and regulations of, or the enabling legislation governing, the Alabama Public Service Commission clearly articulate a policy in favor of collective formulation by carriers.
 
 
 55
 Finally, as with Alabama, whether the policy of the state of Mississippi conforms to the "clearly articulated and affirmatively expressed" standard in Midcal is unclear from the record developed prior to this appeal. A review of the statutory scheme, Miss.Code Ann. §§ 77-7-1 to -341 (1972), contemplates cooperation among the carriers to the limited extent of establishing joint rates. This falls short, however, of a clear policy in favor of joint formulation of any proposed rates. Nor did Mississippi present any rules or regulations of its public service commission which might reveal such a policy. I would therefore remand for further development of the record as to Mississippi and for decision by the district court in light of what I deem to be the appropriate construction of Midcal.
 
 
 56
 For the above reasons, I dissent.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452-October 14, 1980
 
 
 **
 Honorable Charles R. Scott, U. S. District Court Judge for the Middle District of Florida, sitting by designation
 
 
 [1]
 For further elaboration of the facts regarding the role of the rate bureaus, their relationship with the state regulatory commissions, and the general pattern of regulatory procedures in the five subject states, see the district court's carefully written opinion. United States v. Southern Motor Carriers Rate Conference, Inc., 467 F.Supp. 471, 476-78 (N.D.Ga.1979)
 
 
 [2]
 In the district court, the state attorneys general of the states of Alabama, Georgia, Mississippi, North Carolina and Tennessee participated as amici curiae. The National Association of Regulatory Utility Commissioners (NARUC) also was allowed to participate as an intervenor
 
 
 [3]
 In asserting that there is a state compulsion requirement, we do not mean to suggest that private parties may have no role in proposing mandatory state action. In Parker and New Motor Vehicle Bd. v. Orrin W. Fox Co., 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1979), the Supreme Court has made clear that an action may still be compelled by the state even though private parties petitioned for the state to consider requiring such action. See also California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); but cf. Cantor v. Detroit Edison Co., 428 U.S. 579, 594 & n.31, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) (action not required by state even though required by state commission tariff if action proposed by private party and tariff applies only to that party, not to parties statewide). Once a state has adopted some policy, however, whether or not after a petition by a private party, private parties will be exempt from the antitrust laws only if the state requires some action pursuant to that policy
 
 
 [4]
 The Court noted that it might find liability against a private party required to perform some action even if there was no clear state policy favoring the action if so finding would be unfair to the party, 428 U.S. at 594-95, 96 S.Ct. at 3119, and that it might not in all circumstances find that state policy concerns preempted federal antitrust law. Id. at 595, 96 S.Ct. at 3119. These concerns, however, arise only if the threshold state compulsion requirement is met. We find, in any event, no unfairness in this case in holding appellants to be in violation of the Sherman Act, see text at note 22, infra, and no state policy here strong enough to justify preempting federal antitrust law. See note 12, infra
 
 
 [5]
 Neither in its brief nor at oral argument did the government take the position that the state regulatory commissions do not actively supervise the proposed collectively formulated rates through hearings to review the reasonableness of proposed tariffs. Moreover, the record evidence that the commissions routinely suspend the effectiveness of proposed tariffs and conduct hearings satisfies us that the second prong of the Midcal test has been met
 
 
 [6]
 The Supreme Court, in a recent discussion of whether municipal action is state action exempt from antitrust oversight, has seemed to confirm that it views its decisions on state immunity as a continuum, rather than as establishing different standards before and after Midcal. See Community Communications Co. v. City of Boulder, --- U.S. ----, ----, 102 S.Ct. 835, 848, 70 L.Ed.2d 810 (1982). Similarly, the Ninth Circuit recently has used the state compulsion requirement of Goldfarb in the context of applying the Midcal standards. Ronwin v. State Bar of Arizona, 663 F.2d 914, 918 (1981)
 
 
 [7]
 In a footnote immediately following the articulation of its two-pronged standard in Midcal, the Supreme Court cited Note, Parker v. Brown Revisited: The State Action Doctrine After Goldfarb, Cantor, and Bates, 77 Colum.L.Rev. 898, 916 (1977), apparently as an example of the application of its standard. 445 U.S. at 105 n.8, 100 S.Ct. at 943 n.8. That Note, at the cited page, states that "(t)he mere fact that anticompetitive conduct by a private party effectuates a clearly articulated state regulatory policy is not in itself sufficient to justify a state action defense.... The defense is only available if the state has elected to effectuate its policy by requiring the private conduct under attack" (emphasis in original). The Court's citation to the Note is a testament to the continued vitality of the state compulsion requirement
 In footnote 8 the Court also cited Norman's on the Waterfront, Inc. v. Wheatley, 444 F.2d 1011, 1018 (3d Cir. 1971), and Asheville Tobacco Bd. v. FTC, 263 F.2d 502, 509-10 (4th Cir. 1959). Norman's found a mandatory filing program insufficient alone for there to be state action immunity. In Asheville, the Court noted both the absence of required state action and of state supervision. Neither case is inconsistent with, and both implicitly support, a state compulsion requirement in certain circumstances.
 
 
 [8]
 The dissent reasons that Midcal eliminates the state compulsion requirement because the basis for state compulsion is the concern that the economic self-interest of the companies might affect the rate setting process. According to the dissent, the second prong of the Midcal analysis, the requirement of state supervision, assuages that concern. We believe that Midcal itself illustrates the invalidity of the presumption that state compulsion and state supervision have the same rationale. If the dissent were correct, the Supreme Court would have upheld state action immunity on the facts of Midcal, for state supervision would have been unnecessary since the state requirement mandating the filing of contracts and schedules would serve the same purpose. The Court did not, however, so rule, and rightly, for the state does not deprive competitors of their ability to subvert competition merely by requiring them to collude. Rather, as noted earlier, the state compulsion requirement fulfills a purpose entirely different from that underlying state supervision: it reaffirms the holding of Parker that an action must in effect be by the state as sovereign. If private parties were able to choose whether to follow some course of action, the decision concerning whether to pursue that action hardly could be said to be by the state
 
 
 [9]
 It is perhaps ironic that the government seeks to enjoin as a violation of federal antitrust laws activity by motor carriers operating in intrastate commerce that is exempted from federal antitrust laws when performed at the interstate level. Appellant SMCRC attempts to elevate this irony into an argument for implied immunity from the antitrust laws. We reject this argument
 Under 49 U.S.C. § 10706, the collective formulation of rates by motor carriers operating in interstate commerce is exempt from federal antitrust laws once these rates are approved by the Interstate Commerce Commission. According to SMCRC, this express exemption should be extended to collective rate formulation at the intrastate level. As authority for this position, SMCRC relies on Atchison, Topeka & Sante Fe Railway Co. v. United States, 597 F.2d 593 (7th Cir. 1979), which held that this section should be construed to exempt intrastate railroad collective ratemaking that affects interstate commerce. The result in Atchison is explainable, and clearly distinguishable from this case, on the ground that the ICC has jurisdiction under the Shreveport rate doctrine over intrastate railroad rates that affect interstate commerce. See Houston East & West Texas Railway Co. v. United States, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1942). The ICC has no similar jurisdiction over intrastate motor carrier rates. Indeed, 49 U.S.C. § 10521(b) expressly reserves this area for state regulation.
 In the alternative, SMCRC contends that the pervasive state regulation permitted by Section 10521(b) creates an irreconcilable conflict with federal antitrust laws which warrants an implied repeal of the antitrust laws in this situation. As SMCRC concedes, the implied repeal doctrine normally applies only to conflicts between federal antitrust laws and federal regulation, not to conflicts with state regulation. Moreover, the Supreme Court has observed repeatedly that "(r)epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have been found only in cases of plain repugnancy between the antitrust and regulatory provisions." United States v. Philadelphia National Bank, 374 U.S. 321, 350-51, 83 S.Ct. 1715, 1734, 10 L.Ed.2d 915 (1963). This presumption against implied repeal is just as strong where the conflict is with state regulatory policy. Cantor, 428 U.S. at 596-97 & nn.36, 37, 96 S.Ct. at 3120-21 & nn.36, 37. Even where such repugnancy is found, the antitrust laws are abrogated only to the extent necessary for the effective functioning of the regulatory scheme. Silver v. New York Stock Exchange, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963).
 We detect no irreconcilable conflict of the federal antitrust policy with either the Interstate Commerce Act, 49 U.S.C. § 10521(b), or with the existence of state regulation. As we noted above, the ICC has no jurisdiction over intrastate motor carrier rates. The Interstate Commerce Act then poses no conflict with the application of the federal antitrust laws to collective intrastate ratemaking among motor carriers. As to state regulatory policy, if an implied exemption is necessary for the effective functioning of the state scheme, the states may act to immunize private action taken in response to state policy by compelling private conduct as part of a clearly established or affirmatively expressed state policy.
 
 
 [10]
 The State of Georgia, participating as amicus in the district court, presented a 1942 order issued by its public service commission stating that "all for hire motor common carriers operating under Class A certificates be, and they are hereby, directed and required to publish and file with this Commission ... a tariff containing all local and joint class and/or commodity rates applicable between points within Georgia." Record at 693. Pointing to the italicized language, the state argued that the commission "clearly directed all Class 'A' carriers to file a single joint tariff with the Commission," thus indicating its policy in favor of collective action. Id. We are not persuaded that the language of the 1942 order is susceptible of only this interpretation. At best it is ambiguous. Given the statute, only recently amended to insert the provisions outlined in text, it would not, in any event, be controlling
 
 
 [11]
 A "joint rate" is a single rate applied jointly by two carriers to cover a shipment in which one carrier operates over only part of the route and the other carrier serves the remaining distance to the destination
 
 
 [12]
 We note that, even if state compulsion were not a requirement after Midcal, we would still find the state action exception inapplicable here because of the absence of a clearly articulated and affirmatively expressed policy in favor of joint rate applications in any state at issue. In none of these states do the statutes do more than, at most, authorize joint rate agreements. "(A) state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." Parker v. Brown, 317 U.S. 341, 344, 351, 63 S.Ct. 307, 310, 313, 87 L.Ed. 315 (1943). Moreover, Cantor indicates that, for a state to have a clear policy in favor of an action, that action must be essential to the functioning of the state regulatory system. 428 U.S. at 597-98. No state's statutes or regulations indicate, nor does the evidence show, that joint rate agreements are necessary for state ratesetting procedures to work
 
 
 [13]
 In Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court legitimated the joint efforts of businessmen to influence legislative or executive action, even though these efforts were designed to injure their competitors. In holding that this "combination" was not actionable under the Sherman Act, the Court stated:
 A construction of the Sherman Act that would disqualify people from taking a public position on matters in which they are financially interested would thus deprive the government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them.
 Id. at 139, 81 S.Ct. at 530. Later in United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Court followed Noerr in the context of efforts by large mining companies and labor unions to persuade the Secretary of Labor to set wage rates at such high levels that the mines' smaller competitors would be driven out of business. "(J)oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." Id. at 670, 85 S.Ct. at 1593. In California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Court approved the notion that Noerr 's protection extends to activities aimed at influencing administrative agencies.
 
 
 [14]
 With respect to the right to petition aspect of the bureaus' claim, "(i) t is well settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute." California Motor Transport, 404 U.S. at 514, 92 S.Ct. at 613 (citing Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949))
 
 
 [15]
 Appellants attempt to undercut the force of the Supreme Court's rationale by pointing out that in states such as North Carolina the public service commission regulates not only the reasonableness of rates but also the collective agreement pursuant to which rate proposals are formulated. See N.C.Gen.Stat. § 62-152.1 (Cum.Supp.1981). In essence, appellants argue that the fact of state regulation not only renders their activities immune as state action but also precludes characterization of their activities as price fixing. They press the point even further by arguing that the regulatory context of this case mandates application of a rule of reason analysis. For reasons we shall discuss infra, we decline to accord such extensive significance to the impact of state regulation
 
 
 [16]
 The Interstate Commerce Commission has so viewed collective ratemaking agreements as to interstate activity
 (W)hether an agreement will have anticompetitive effects is presumed. This presumption arises from the holdings of the Courts that the interests to be protected by the antitrust laws are always harmed by collective rate-making agreements and that agreements such as these violate the antitrust laws per se without official exemption.
 Tidewater Coal Demurrage Agreement, 356 I.C.C. 66, 75 (1978). See also H.Rep.No. 1100, 80th Cong. 2d Sess. (1947), reprinted in (1948) U.S.Code Cong.Serv. 1844 (referring to the uncertainty as to the legality under the antitrust laws of such agreements).
 
 
 [17]
 Broadcast Music was decided together with American Society of Composers, Authors and Publishers v. Columbia Broadcasting System, Inc
 
 
 [18]
 The licensing scheme employed by both ASCAP and BMI followed a similar pattern. Owners of copyrighted works, who under copyright law alone possess the exclusive right to perform the work publicly for profit, grant the organization of which they are a member (ASCAP or BMI) a nonexclusive right to license performances of their work. A blanket license from ASCAP or BMI gives the licensee, for a flat fee or percentage of total revenues, the right to perform any and all of the compositions owned by members of the organization as often as desired for a stated term. The organization distributes royalties generated by the licenses among its members in a manner that reflects the nature and amount of use of their music
 
 
 [19]
 Broadcast Music and its rule of reason approach are distinguishable on yet another ground. The Court noted that the blanket license offered by ASCAP and BMI was a product different from the license which could be offered by individual copyright owners since the former consisted of many individual compositions plus the aggregating services performed by the organization. Hence, ASCAP and BMI were sellers, separate from the copyright owners, in a product market in which individual composers could not compete. 441 U.S. at 21-23, 99 S.Ct. at 1563-64. The rate bureaus cannot be viewed analogously as purveyors of a product or service which could not be provided by their individual constituent member carriers
 
 
 [20]
 Asserted advantages include cost-savings in the formulation and publication of rate tariffs, which in turn enable small carriers, which lack the means to prepare and justify their own rate proposals, to remain competitive with large carriers
 
 
 [21]
 We are aware that our colleagues in the Ninth Circuit have declined to apply a per se rule to the setting by majority vote of maximum fees that physician members of foundations for medical care (FMC) may claim in full payment for health services they provide to policy holders of FMC-approved insurance plans. Arizona v. Maricopa County Medical Society, 643 F.2d 553 (9th Cir. 1980), cert. granted, 450 U.S. 979, 101 S.Ct. 1512, 67 L.Ed.2d 813 (1981). This result, we believe, is based on too broad a reading of the decision in Broadcast Music
 
 
 [22]
 See note 4, supra; cf. Cantor, 428 U.S. at 592-95, 96 S.Ct. at 3118-19 (discussing an unfairness theory as support for clothing private conduct required by the state with state action immunity); Mid-Texas Communications, 615 F.2d at 1380 ("Fairness to the regulated industry is an important factor ... in determining whether antitrust immunity exists.")
 
 
 [1]
 Midcal was decided after the district court had entered final judgment in this case. Hence the district court did not have the benefit, as do we, of the Supreme Court's pronouncement on this subject
 
 
 [2]
 In announcing its two-pronged test in Midcal, the Court purported to derive it from the Parker line of cases, citing cases involving private defendants, Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), and Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), as well as cases involving governmental defendants, Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), and New Motor Vehicle Bd. v. Orrin W. Fox Co., 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978)
 
 
 [3]
 There may be substantive limits on what conduct the state may immunize by making the challenged restraint a state policy. Indeed, there is some suggestion in Supreme Court precedent that federal antitrust laws do place substantive limits on the content of state economic regulation. See, e.g., Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) (invalidating a Louisiana fair trade statute containing a "non-signer" provision under which a retailer could be enjoined from knowingly underselling another retailer whose prices were set under a resale price maintenance contract, exempt from antitrust laws under the Miller-Tydings Act, with a supplier). But see 1 P. Areeda & D. Turner, Antitrust Law 70 (1978) (interpreting this decision as an inadequate supervision case). See generally Posner, The Proper Relationship Between State Regulation and the Federal Antitrust Laws, 49 N.Y.U.L.Rev. 693 (1974). Those limits may be reached in areas, unlike the private utility regulation involved here, that have not traditionally been regulated by the states
 Fortunately, we are not called upon here to delineate those boundaries. At least one member of the Supreme Court and some commentators have urged an express preemption analysis, which involves the difficult weighing of the state interest at stake against the federal interest in a competitive economy. See Cantor v. Detroit Edison Co., 428 U.S. 579, 605, 96 S.Ct. 3110, 3124, 49 L.Ed.2d 1141 (1976) (Blackmun, J., concurring); Posner, supra; Note, Parker v. Brown Revisited: The State Action Doctrine After Goldfarb, Cantor, and Bates, 77 Colum.L.Rev. 898, 929-30 (1977) (suggesting that a preemption analysis explains the Court's result in some of the cases in the Parker line). But see Cantor, 428 U.S. at 627, 96 S.Ct. at 3134 (Stewart, J., dissenting) (warning that a preemption approach is a return to the discarded substantive due process doctrine). Cf. Community Communications Co. v. City of Boulder, --- U.S. ----, ----, 102 S.Ct. 835, 845, 70 L.Ed.2d 810 (1982) (Rehnquist, J., dissenting) (arguing that state action should be analyzed as a preemption problem). The Court, however, has never forthrightly adopted this approach, and, for the present, it appears to have resolved the tension between federalism and antitrust concerns on the side of federalism, albeit with the requirement of active state supervision of the anticompetitive activity. Midcal thus reiterates the federalism concerns at the heart of Parker.
 
 
 [4]
 Professor Areeda has suggested that Midcal 's active supervision requirement is inapplicable to governmental defendants. Areeda, Antitrust Immunity for "State Action" After Lafayette, 95 Harv.L.Rev. 435, 445 n.50 (1981) ("A few courts erroneously appear to use the Midcal formula (clearly articulated state policy plus active supervision of private parties) to require state supervision of governmental defendants."). In Community Communications Co. v. City of Boulder, the Supreme Court expressly declined to decide whether the active supervision criterion must be met by a municipality with respect to the challenged ordinance. --- U.S. ----, ---- n.14, 102 S.Ct. 835, 841 n.14, 70 L.Ed.2d 810 (1982). If that criterion serves the function identified above, Professor Areeda's suggestion would appear correct
 
 
 [5]
 The existence of a state action immunity enables states, like the federal government itself, to define areas inappropriate for market control. Moreover, the adequate supervision criterion ensures that state-federal conflict will be avoided in those areas in which the state has demonstrated its commitment to a program through its exercise of regulatory oversight. At the same time, it guarantees that when the Sherman Act is set aside, private firms are not left to their own devices. Rather, immunity will be granted only when the state has substituted its own supervision for the economic constraints of the competitive market
 
 
 [1]
 P. Areeda & D. Turner, Antitrust Law 73 (1978) (footnotes omitted)
 
 
 [6]
 As indicated by the majority, see note 5 supra in the majority opinion, the government did not contend on appeal that the active supervision requirement has not been satisfied