**NATIONAL BANCARD CORPORATION (NaBANCO), a Florida Corporation, Plaintiff-Appellant,**

v.

**VISA U.S.A., INC., Defendant-Appellee.**

No. 84–5818.

United States Court of Appeals, Eleventh Circuit.

Jan. 10, 1986.

Rehearing and Rehearing En Banc Denied Feb. 18, 1986.

---

James M. Landis, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Sylvia H. Walbolt, Tampa, Fla., for plaintiff-appellant.

Paul C. Huck, Fleming and Huck, P.A., Miami, Fla., M. Laurence Popofsky, Heller, Ehrman, White & McAuliffe, Stephen V. Bomse, Meryl Macklin, San Francisco, Cal., for defendant-appellee.

Before JOHNSON and HENDERSON, Circuit Judges, and ALLGOOD,* District Judge.

HENDERSON, Circuit Judge:

National Bancard Corp. (NaBanco) filed this suit against VISA U.S.A. (VISA), alleging that VISA violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by fixing certain bank credit card interchange rates. After a bench trial that consumed approximately nine weeks, the United States District Court for the Southern District of Florida, in an exhaustive opinion, concluded

---

\* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

that NaBanco failed in its efforts to prove a violation of the antitrust laws. *See National Bancard Corp. v. VISA, U.S.A.,* 596 F.Supp. 1231 (S.D.Fla.1984) (hereinafter cited as *NaBanco*).

NaBanco appeals from this judgment, claiming that the district court erred in applying the rule of reason rather than the per se rule to the facts of the case. Alternatively, NaBanco contends that even under a rule of reason analysis VISA's conduct was violative of Section 1 of the Sherman Act.

The factual background to this case revolves around the workings of the bank credit card industry in general and VISA's operational procedures in specific.[1] Bank credit card transactions generally can involve four different entities: (1) cardholders who use the cards to purchase goods and services; (2) merchants who accept the cards in exchange for goods and services; (3) banks that issue cards to cardholders (card-issuing banks); (4) banks that contract with merchants to accept the credit cards (merchant-signing banks). In some instances only three parties are implicated because the card-issuing bank also contracts with the merchant to accept the card.[2]

In a typical four-party transaction, a consumer is issued a bank credit card by a card-issuing bank, Bank X. A merchant-signing bank, Bank Y, contracts with a shopowner to join the VISA network and accept the VISA card. The cardholder then uses the card to purchase goods from the merchant, who furnishes the cardholder with the merchandise and then sends the cardholder's charge receipt (the paper) to Bank Y, the bank with which the shopowner has signed a VISA contract. Bank Y "buys" the paper from the merchant pursuant to their contract, but at less than face value. This discounted amount is known as the "merchant discount." Bank Y then must "interchange" the paper with Bank X, so that Bank X can bill the cardholder in accordance with the terms of their contract.

The difficulties in a credit card or "cashless" transaction arise because each such transaction generates a trail of paperwork. This transactional paper representing the exchange is transferred among the parties until each eventually bears the burden that it has contracted to assume. This case concerns certain fees that attach in the transfer, or interchange, of this paper between the merchant-signing bank and the card-issuing bank.

The present action arose as a result of the "Issuer's Reimbursement Fee" (IRF) that the VISA system imposes when the merchant-signing bank forwards the cardholder's paper to the card-issuing bank for collection. In the VISA system this fee, a small fixed percentage of each charge, is levied only when the interchange is conducted through VISA's computerized service known as BASE II. Significantly, the parties to the interchange are not required to use BASE II. Merchant and issuer institutions are free to negotiate a different rate and bypass the BASE II system entirely.

In today's technology, the majority of these transactions are automated, so that the banks' and merchants' computers actually credit each others' computerized accounts. The effect, however, is the same as if each party were to present the paper in person and receive cash in exchange.

---

1. The district court's opinion provides an interesting and detailed history of the American credit card business and other payments systems. See *NaBanco,* 596 F.Supp. at 1236–38 & nn 4–8.

2. These three-party dealings generally are known as "on-us" transactions. Since no interchange occurs, no fee is charged in "on-us" purchases. VISA's precursor, BankAmericard, was purely a three-party bank card because cards were issued and merchants were recruited only by Bank of America. The BankAmericard gave way to VISA in 1977. "On-us" transactions often occur even when several banks issue cards and sign merchants because the same bank that issued the card may have signed the merchant to accept the card. Obviously, this would occur most often in a card-issuing bank's surrounding community.

For the merchant-signing bank to profit from its middleman position, the payment it receives from the card-issuing bank must be greater than the discounted amount the merchant bank originally paid the merchant. In practical terms, the IRF may not exceed the merchant discount for the merchant-signing bank to benefit from the transaction. Because each merchant-signing bank negotiates the amount of its discount with the merchant, each may ensure that it maintains such a profit margin by setting the merchant discount accordingly.

On the other hand, the card-issuing bank is responsible for collecting all sums due and payable by its cardholders. All risk of loss resulting from nonpayment, default or any other reason falls solely on the issuer bank. Additionally, until recently, card-issuing banks did not charge an annual user fee to each cardholder for fear of losing patrons to competing bank cards that made no such charge. The card-issuing banks also traditionally have provided a so-called "convenience period" for their customers. This period, usually comprising several weeks, allows cardholders to avoid any interest payments if their account is paid in full before the next billing cycle—in effect an interest-free loan.

The IRF ostensibly is designed to shift to the merchant-signing bank some of the costs—from risk of loss, lack of user fee, and convenience period expense—that fall solely on the card-issuing banks. NaBanco contends that this practice constitutes horizontal price fixing and is therefore a per se violation of Section 1 of the Sherman Act. NaBanco further asserts that even if the rule of reason is invoked, VISA's IRF is unreasonably anticompetitive. VISA, however, maintains that the BASE II IRF helps create a product that could not exist otherwise and therefore is neither subject to traditional per se attack nor in contravention of the Sherman Act when subjected to rule of reason evaluation.

The purpose of the IRF, and the basis of NaBanco's attack on it, are intertwined in the development of BankAmericard, VISA,

and NaBanco.[3] The Bank of America (BA) originally marketed the three-party BankAmericard on a statewide basis in California. In 1966 BA decided to expand its system nationwide by licensing local banks to use the BankAmericard name, thereby making BankAmericard a four-party transaction. As part of the new national system, a variable interchange fee system was created. Each merchant-signing bank was required to inform the card-issuing bank of either the actual or average merchant discount it charged. The fee was based on this information.

After the original BankAmericard network expanded, the variable interchange fee system did not work effectively. A for-profit nonstock-membership corporation, NBI, was therefore formed in 1970. NBI's board of directors adopted a new uniform fee system, the IRF, in late 1971. NBI became VISA in 1977.

VISA, which included over 13,000 members in 1983, has two types of membership. "Proprietary" members both issue cards and sign merchants. In 1983 they made up approximately 14% of all VISA members. "Agent" members choose only to sign merchants to participate in the VISA system. The sole significant difference between proprietary and agent members is that only proprietary members may vote, or serve on, VISA's board of directors. Thus, agent members have no input in determining VISA policies, including the existence and amount of the IRF. It is important to note that VISA members voluntarily choose the type of membership they desire and may elect to issue cards and thereby gain a voice in the VISA decisionmaking process. The various members also compete vigorously against one another to issue cards and sign merchants.

NaBanco does not belong to the VISA system. It serves as a processing agent for VISA members and receives all or part of the merchant discount cf the VISA member to whom it provides a processing service. For purposes of this decision, how-

---

**3.** For an in-depth background of the parties, see *NaBanco,* 596 F.Supp. at 1238–40.

ever, NaBanco stands in the exact position of an agent member.[4]

NaBanco's basic complaint is that the IRF reduces or eliminates its ability to compete with proprietary VISA members that both issue cards and sign merchants. Because "on-us" transactions (in which the card-issuing and merchant-signing bank is the same) involve no interchange, and therefore are not subject to the IRF, proprietary members conducting "on-us" transactions can reduce the merchant discount they charge. NaBanco alleges that it is unable to compete because it must keep its merchant discount higher than the IRF to ensure a profit. Merchants therefore do not choose to contract with NaBanco because they receive a better merchant discount from proprietary VISA members. *See NaBanco,* 596 F.Supp. at 1240.

Because both "on-us" and IRF transactions involve many of the same costs, NaBanco claims that by reducing the merchant discount in "on-us" transactions, proprietary VISA members demonstrate that the IRF is not cost related. According to this argument, the IRF is either unnecessary or intentionally set at a level to discourage purely merchant-signing competitors. When NaBanco seeks to sign and service merchants, it competes with merchant-signing banks that also issue VISA cards. NaBanco alleges that banks that also issue cards have set the IRF to keep purely merchant-signing banks from being able to compete. Therefore, in NaBanco's view these proprietary members are equivalent to a group of competitors who have agreed to sell goods to each other (or, in this case, to themselves) at a lower rate than that offered to NaBanco. NaBanco urges that, because the individual card-issuing and merchant-signing banks individually can and should negotiate the interchange fee, the IRF system, as constituted, amounts to horizontal price fixing and is per se violative of Section 1 of the Sherman Act.

As stated earlier, NaBanco essentially challenges (1) the district court's application of the per se rule, and (2) its finding that the IRF is procompetitive under the rule of reason.

Findings of fact by the district court may be reversed only when they are clearly erroneous. Fed.R.Civ.P. 52(a). The reviewing court, looking at all the evidence, must be "left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it.... Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City,* 470 U.S. ——, ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 528 (1985). This standard governs the district court's findings on the second issue.

■ Errors of law are freely reviewable and not protected by the clearly erroneous rule. *See Pullman-Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1786, 72 L.Ed.2d 66, 79 (1982). Whether to apply a per se or rule of reason analysis is a question of law, and therefore freely reviewable, yet it is predicated on a factual inquiry into the restraint's competitive effect. *See NCAA v. Board of Regents of University of Oklahoma,* 468 U.S. 85, ——, 104 S.Ct., 2948, 2962, 82 L.Ed.2d 70, 85 (1984) ("the essential inquiry remains the same— whether or not the challenged restraint enhances competition."). As the Supreme Court has noted, "no bright line separat[es] per se from Rule of Reason analysis." *Id.,* 468 U.S. at —— n. 26, 104 S.Ct. at 2962 n 26, 82 L.Ed.2d at 86 n. 26.

---

**4.** NaBanco cannot be a member of VISA because it is not eligible for federal deposit insurance. Nevertheless, NaBanco acts as a processing agent for merchant-signing VISA members. As such, it receives the cardholder paper from merchants, reimburses merchants, and then exchanges the paper with the card-issuing banks. NaBanco also has served as an agent of card-issuing VISA members. *NaBanco,* 596 F.Supp. at 1239–40. The district court properly held that NaBanco had standing to pursue this antitrust action. *Id.* at 1241–47.

It is axiomatic that Section 1 of the Sherman Act, if read literally, would strike down every contract. *NCAA*, 468 U.S. at ——, 104 S.Ct. at 2959, 82 L.Ed.2d at 82; *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683, 687 (1918); *Abadir & Co. v. First Mississippi Corp.*, 651 F.2d 422, 425 (5th Cir.1981).[5] The Supreme Court, however, "repeatedly [has] recognized [that] the Sherman Act was intended to prohibit only unreasonable restraints of trade." *NCAA*, 468 U.S. at ——, 104 S.Ct. at 2959, 82 L.Ed.2d at 82; *see National Society of Professional Engineers v. United States*, 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637, 648 (1978) (hereinafter cited as *Engineers*).

To provide the needed flexibility to Section 1, the courts adopted the rule of reason, which is grounded in the common law.[6] *Engineers*, 435 U.S. at 688, 98 S.Ct. at 1363, 55 L.Ed.2d at 648; *Abadir*, 651 F.2d at 425. The Supreme Court has clearly articulated that the rule of reason is the vehicle by which the Sherman Act—the "comprehensive charter of economic liberty," *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545, 549 (1958)—is to be implemented. *See Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48, 58 (1982) (hereinafter cited as *Maricopa*);

*Engineers*, 435 U.S. at 687–89, 98 S.Ct. 1363–64, 55 L.Ed.2d at 647–49; *Chicago Board of Trade*, 246 U.S. at 238–39, 38 S.Ct. at 244, 62 L.Ed. at 687; *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). As this court's predecessor has held, the rule of reason is the "basic test for the legality of a business practice which allegedly operates to restrain trade." *United States v. Multi-List, Inc.*, 629 F.2d 1351, 1362 (5th Cir.1980); *see Continental TV, Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568, 579–80 (1977) (hereinafter cited as *Sylvania*); *Abadir*, 651 F.2d at 425.

The rule of reason[7] necessitates an "elaborate inquiry into the reasonableness of a challenged business practice." *Maricopa*, 457 U.S. at 343, 102 S.Ct. at 2472, 73 L.Ed.2d at 58. It therefore is a time-consuming process that entails significant costs. *Id.* Other difficulties constricting the use of the rule of reason include the general lack of judicial expertise in sophisticated economic analysis as well as the lack of certainty that such case law produces. *Id.*

Given these drawbacks to rule of reason scrutiny, the courts have developed a per se rule that applies a conclusive presumption that certain restraints automatically are unreasonable, and therefore illegal, without further investigation.[8] The need

---

**5.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

**6.** The best common law basis for the rule of reason is Mitchel v. Reynolds, 24 Eng.Rep. 347 (1711). *Mitchel* involved the enforceability of a vendor's covenant not to compete with a vendee with respect to the sale of a bakery. The covenant was upheld as reasonable because it was ancillary to the contract, which was procompetitive. *See Engineers*, 435 U.S. at 688–89, 98 S.Ct. at 1363–64, 55 L.Ed.2d at 648.

**7.** The classic statement defining the rule of reason was provided by Justice Brandeis in *Chicago Bd. of Trade*, 246 U.S. at 238, 38 S.Ct. at 244, 62 L.Ed. at 687.

The true test of legality is whether the restraint imposed is such as merely regulates or

perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

**8.** The per se rule was set forth by the Supreme Court in *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d

for efficiency and certainty in effect outweigh specific fact settings in which an action held to be per se unreasonable might be decided differently under the rule of reason. *See Maricopa*, 457 U.S. at 344 & n 16, 102 S.Ct. at 2473 & n 16, 73 L.Ed.2d at 58 & n 16. In short, "[t]he per se rule is the trump card of antitrust law. When an antitrust plaintiff successfully plays it, he need only tally his score." *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1362–63 (5th Cir.1980) (hereinafter cited as *Multi-List*).

The Supreme Court has recognized that "whether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same—whether or not the challenged restraint enhances competition." *NCAA*, 468 U.S. at ——, 104 S.Ct. at 2962, 82 L.Ed.2d at 85–86. Thus, "no bright line separat[es] per se from Rule of Reason analysis. Per se rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct." *Id.*, 468 U.S. at —— n. 26, 104 S.Ct. at 2962 n. 26, 82 L.Ed.2d at 86 n. 26. Certain types of practices, however, have emerged as traditionally per se violations. *See United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) (vertical price fixing agreements); *Timken Roller Bearing Co. v. United*

*States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951) (horizontal market divisions); *International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) (tying arrangements); *Fashion Originators' Guild v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (group boycotts).

Until *Broadcast Music, Inc. v. Columbia Broadcasting Co.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (hereinafter cited as *BMI* ), horizontal price fixing consistently was held to fall in the per se category.[9] In *BMI*, however, the Supreme Court warned that "[l]iteralness is overly simplistic and often overbroad," *id.* at 9, 99 S.Ct. at 1557, 60 L.Ed.2d at 9, and refused to use the per se rule even though the Court held that the practice in question literally was price fixing.

In *BMI*, Broadcast Music, Inc. (BMI) and the American Society of Composers, Authors, Composers and Publishers (ASCAP) issued blanket licenses to copyrighted music compositions. The fees for these licenses were set by ASCAP and BMI and clearly qualified as price fixing in a strict sense. *BMI*, 441 U.S. at 8, 99 S.Ct. at 1556, 60 L.Ed.2d at 9. The Court, however, noted that

this is not a question simply of determining whether two or more potential competitors have literally "fixed" a "price."

545, 549 (1958): "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *See Broadcast Music, Inc. v. Columbia Broadcasting Co.*, 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1, 9 (1979); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *United States v. Topco Assocs Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

**9.** "A price fixing agreement between competitors is the classic example of [a per se] arrangement." *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 1556, 80 L.Ed.2d 2, 11 (1984). *See, Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 102 S.Ct.

2466, 73 L.Ed.2d 48 (1982); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980); *National Soc'y of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486 (11th Cir.1985); *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414 (11th Cir.1984); *Construction Aggregate Transport, Inc. v. Florida Rock Inds., Inc.*, 710 F.2d 752 (11th Cir.1983); *Joe Regueira, Inc. v. American Distilling Co.*, 642 F.2d 826 (5th Cir.1981); P. Areeda, *The Rule of Reason in Antitrust Analysis* 22 (1981).

As generally used in the antitrust field, "price fixing" is a shorthand way of describing certain categories of business behavior to which the per se rule has been held applicable. The Court of Appeals' literal approach does not alone establish that this particular practice is one of those types or that it is "plainly anticompetitive" and very likely without "redeeming virtue." ... Thus, it is necessary to characterize the challenged conduct as falling within or without that category of behavior to which we apply the label "per se price fixing."

*Id.*, 441 U.S. at 8–9, 99 S.Ct. at 1556–57, 60 L.Ed.2d at 9–10. *See Cha-Car, Inc. v. Calder Race Courses, Inc.*, 752 F.2d 609, 613 (11th Cir.1985) ("The *per se* doctrine should not be extended to restraints of trade that are of ambiguous effect; any departure from the rule of reason standard must be based upon demonstrable economic effect, rather than formalistic line drawing."). Consequently, while some price fixing is per se illegal, other arrangements that literally fix prices are judged under the rule of reason.

In an effort to delineate which factors distinguish these categories, the Court went on to set out the analytic framework for consideration. The "inquiry must focus on whether ... the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, and in what portion of the market, or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.'" *BMI*, 441 U.S. at 19–20, 99 S.Ct. at 1562–63, 60 L.Ed.2d at 16 (quoting *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 2875 n. 16, 57 L.Ed.2d 854, 872 n. 16 (1978)). Because the blanket license was not a " 'naked restraint of trade with no purpose except stifling of competition,' but rather accompanie[d] the integration of sales, monitoring, and enforcement against unauthorized copyright use," it was not illegal per se.

*BMI*, 441 U.S. at 20, 99 S.Ct. at 1563, 60 L.Ed.2d at 16 (quoting *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738, 746 (1963)).

The blanket license in *BMI* was a practical necessity because it was virtually impossible for thousands of composers to negotiate individually over the use of each song, for each user to report amount of use, and for each composer to police the use of his works by authorized and unauthorized users. Thus, the blanket license arrangement "created a forum for buyers and sellers ... and yielded improvements in the market for performing rights of copyrighted compositions which were unrelated to price." *United States v. Southern Motor Carriers' Rate Conference*, 672 F.2d 469, 479 (5th Cir. Unit B 1982), *aff'd*, 702 F.2d 532 (5th Cir. Unit B 1983) (en banc), *rev'd on other grounds*, 471 U.S. ——, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985).[10]

*BMI*'s underlying teaching therefore appears to be that courts should look to whether the restraint at issue potentially could create an efficiency enhancing integration to which the restraint is ancillary. In other words, the issue is whether the price fixing *"achieve[s] purposes unrelated to price formation."* *Southern Motor Carriers*, 672 F.2d at 479 (emphasis in the original), *aff'd*, 702 F.2d 532 (5th Cir. Unit B 1983) (en banc), *rev'd on other grounds*, 471 U.S. ——, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). This analytic framework closely parallels the approach proposed by Professor, now Judge, Robert H. Bork. *See* Bork, *The Rule of Reason and the Per Se Concept: Price Fixing and Market Division*, 75 Yale L.J. 373, 474 (1966) (no per se analysis if restraint "accompanies a contract integration" and "is ancillary to the contract integration").

As could be expected, defendants charged with horizontal price fixing ecstatically embraced *BMI*, viewing it as an alluring oasis of hope in a previously bar-

---

**10.** In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982), the Eleventh Circuit Court of Appeals adopted as precedent all decisions of Unit B of the former Fifth Circuit Court of Appeals.

**600**

ren desert.[11] The Supreme Court, however, has refused to view *BMI* in such sweeping terms, instead declining to find it applicable to any and all subsequent litigants.[12]

In this case the district court held that the IRF qualified for rule of reason treatment under *BMI*. *NaBanco*, 596 F.Supp. at 1252–56. Whether the IRF charged by VISA is price fixing[13] subject to the per se rule, depends in large part on how *BMI* is analyzed and applied. Unfortunately, subsequent cases have left us without clear standards for determining the application of the per se rule in price fixing cases.

In *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980), the Court reversed the decision of the Ninth Circuit Court of Appeals that beer wholesalers who agreed to stop extending credit to beer retailers had not committed a per se violation of Section 1.

The Court concluded that granting an interest free credit period was the equivalent to a discounted price for that period of time and thus "must be characterized as an inseparable part of the price." *Id.*, 446 U.S. at 648, 100 S.Ct. at 1928, 64 L.Ed.2d at 585. The Court then summarily applied the per se rule and disposed of the case without inquiring into whether the agreement accomplished any efficiency creating integration among the wholesalers, thus failing to engage in the analysis suggested in *BMI*.[14]

Similarly, in *Arizona v. Maricopa County Medical Society*, 643 F.2d 553 (9th Cir. 1980), *rev'd*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), the Court held that an agreement among physicians to set limits on fees was per se illegal. The doctors in an association voted on the maximum fees they would charge in full payment for services rendered to policyholders of certain

---

11. *BMI* is just one of several cases that appeared to signal a retreat from rigid application of the per se rule. In *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), the Court refused to apply the per se rule summarily to a tying arrangement, instead noting that in-depth market analysis was required to determine the procompetitive aspects of the tie-in. *See NCAA*, 468 U.S. at ——, 104 S.Ct. at 2959–63, 82 L.Ed.2d at 85–89; *Continental TV, Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (reversing an earlier holding that some types of vertical market division were per se violative; Court required more extensive evidence of economic utility of the restraint). These cases demonstrate that "invocation of [the per se rule] must be limited to those situations which fairly fall within its rationale," rather than a formalistic approach. *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1363 (5th Cir.1980).

12. For example, the Court twice rejected the Ninth Circuit's determination that antitrust defendants qualified for rule of reason analysis under *BMI*. *See Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980). The Court also refused to extend *BMI* to the NCAA. See *NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. ——, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Similarly, the former Fifth Circuit Court of Appeals addressed *BMI*'s availability only on one occasion, and refused to find it applicable. *See*

*United States v. Southern Motor Carriers Rate Conference, Inc.*, 672 F.2d 469, 479–80 (5th Cir. Unit B 1982), *aff'd*, 702 F.2d 532 (5th Cir. Unit B 1982) (en banc), *rev'd on other grounds*, 471 U.S. ——, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985).

13. From an economist's viewpoint, the VISA IRF may not even qualify as a "price," because it would be driven upward by unrestrained competition. See Baxter Deposition, Vol. I, at 57 (Feb. 25, 1981). Professor Baxter, who appeared as a witness for VISA, subsequently published his research in bank transactional paper. See Baxter, *Bank Interchange of Transactional Paper: Legal and Economic Perspectives*, 26 J.L. & Econ. 541 (1981). The article includes an excellent explanation of the economic arguments favoring an interchange fee of some sort. It concludes that the economics of the system indicate that interchange fees are not horizontal price fixing, but rather act as equilibratory devices necessary to avoid "chaotic results … higher fees and instability within card systems." *Id.* at 586. In Baxter's opinion, such a fee is legally valid so long as all members of a four-party payment system have the option to bypass the required fee and negotiate their own fee. *Id. See* In Re UATP—1976, 85–11 C.A.B. 2481, 2506 (1980). As mentioned earlier, the Base II system is not mandatory and may be bypassed if the VISA members so choose.

14. Commentators have approved the result in *Catalano* while criticizing its economics. *See* W. Liebler, *Antitrust Adviser*, 30–31 (2d ed. 1984); P. Areeda, *supra* n. 8 at 33–34.

approved insurance plans. The Ninth Circuit Court of Appeals felt the plan should be subjected to the rule of reason. The Supreme Court disagreed. The Court apparently abandoned its *BMI* standards and followed a formalistic approach which indicated that all price fixing was per se violative even if it created efficiencies. *Maricopa*, 457 U.S. at 351, 102 S.Ct. at 2476, 73 L.Ed.2d at 63. The dissent pointed out the inconsistency between *BMI* and *Maricopa* and stressed that the court "must determine whether the procompetitive economics that the arrangement purportedly makes possible are substantial and realizable in the absence of such an agreement." *Id.*, 457 U.S. at 362, 102 S.Ct. at 2482, 73 L.Ed.2d at 70.[15]

*BMI* and *Sylvania* indicate that even if the IRF literally qualifies as price fixing, it may be subject to the rule of reason if it is no greater than reasonably necessary to achieve a legitimate commercial objective (i.e., has a procompetitive purpose), has no substantial anticompetitive impact, and is no broader than necessary to accomplish its procompetitive goals. *See United States v. Jerrold Electronics Corp.*, 187 F.Supp. 545, 556 (E.D.Pa.1960), *aff'd mem.*, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961). Thus, if interchange reimbursement could be left to individual negotiation without threatening the existence and functioning of the VISA system, any effort to impose a set fee would be properly categorized as per se unreasonable. The question is whether the restraint is necessary for the existence of the product.

It is equally true that the Sherman Act allows restraints that are necessary to the procompetitive production of a joint venture's product. "Joint ventures and other cooperative agreements are ... not usually unlawful, at least not as price-fixing schemes, where the agreement on price is

necessary to market the product at all." *BMI*, 441 U.S. at 23, 99 S.Ct. at 1564, 60 L.Ed.2d at 18–19; *see NCAA*, 468 U.S. at ——, 104 S.Ct. at 2967, 82 L.Ed.2d at 84; *Multi-List*, 629 F.2d at 1368. Such arrangements normally are subject to rule of reason analysis because whatever restraint they impose is ancillary and counterbalanced by otherwise unattainable procompetitive benefits. *Maricopa*, 457 U.S. at 365, 102 S.Ct. at 2484, 73 L.Ed.2d at 72 (Powell, J., dissenting). A partnership is the best example of such a venture. *See BMI*, 441 U.S. at 9, 99 S.Ct. at 1556, 60 L.Ed.2d at 9–10. The issue thus posed is whether the IRF, as an element of the cost of doing business, must be set by the joint manufacturers.

According to NaBanco, three distinct markets exist—one each for card-issuing services, merchant-signing services and "IRF-like" interchange services. It argues that the card-issuing banks sell receivables to merchant-signing banks with the issuing banks directly fixing the prices of those sales through their control of VISA's board of directors. It is this conduct that NaBanco characterizes as price fixing .and subject to the per se rule.

We agree with the district court, however, that the evidence adduced at the trial instead demonstrates a complex market relationship between "cardholder and merchant demands for the VISA service suggestive of a joint venture." *NaBanco*, 596 F.Supp. at 1253. This joint enterprise is not subject to per se scrutiny because it is a necessary element in the creation of efficiency creating integration.

VISA exhibits characteristics of a joint venture, even if it is not technically a "joint venture." [16] It is an entity that has partially integrated some functions, such as the

---

**15.** One commentator maintains that the Court's position in *Maricopa* "made it impossible for the majority to articulate a principled explanation of the Court's unanimous decision in [*BMI*]." W. Liebeler, *supra* note 14 at 35. *See generally Maricopa*, 457 U.S. at 361–67, 102 S.Ct. at 2482–85, 73 L.Ed.2d at 70–73. (Powell, J., dissenting).

**16.** The various VISA members neither share profits and losses nor commingle management functions. Each member also competes actively against other members in a variety of ways. This results in merchant-signing banks competing with card-issuing banks to enroll cardholders. *See NaBanco*, 596 F.Supp. at 1253.

IRF, to develop a product—the VISA card [17]—that none of its members could produce individually. The product, then, "is truly greater than the sum of its parts." *BMI*, 441 U.S. at 21–22, 99 S.Ct. at 1563, 60 L.Ed.2d at 17. For a payment system like VISA to function, rules must govern the interchange of the cardholder's receivable. The IRF represents one such rule establishing a "necessary" term, without which the system would not function.[18]

The IRF is a mechanism by which VISA ensures the universality of its card, not a price fixing device to squeeze out entrepreneurs like NaBanco. NaBanco, however, argues that each VISA member could issue its own plastic card, thereby proving that the IRF is not "necessary" to create the product. This reasoning misses the mark because even if each member could afford to issue its own card, universality of acceptance—the key element to a national payment system—could not be guaranteed absent prearranged interchange rules. Consequently, the restraint is "a necessary consequence of the integration necessary to achieve these efficiencies." *Id.* at 21, 99 S.Ct. at 1563, 60 L.Ed.2d at 17. As such, it must be weighed under the rule of reason.

The Civil Aeronautics Board (the CAB), faced with a strikingly similar fact pattern, examined and upheld, under the rule of reason, a fixed-percentage cost-sharing interchange arrangement to reimburse one airline that provided credit card service to passengers flying on a different carrier. See *In Re UATP—1976*, 85–11 CAB 2481 (1980). The 1% charge was determined to be a price agreed to among joint venturers, *id.* at 2504, which "[did] not substantially reduce or eliminate competition." *Id.* at 2503. The CAB found that the interchange fee was a "legitimate method of apportioning expenses among" the joint venturers,

and that the uniform interchange fee "may very well be necessary to the continued functioning" of the universal payment system. *Id.* at 2505. Notably, the CAB also required that the plan be modified to provide member carriers with the option of entering into private interchange arrangements, *id.* at 2506, just as VISA permits its members to bypass the Base II interchange system. *See* Baxter, *supra* note 13, at 586.

Another justification for evaluating the IRF under the rule of reason is because it is a potentially efficiency creating agreement among members of a joint enterprise. There are two possible sources of revenue in the VISA system: the cardholders and the merchants. As a practical matter, the card-issuing and merchant-signing members have a mutually dependent relationship. If the revenue produced by the cardholders is insufficient to cover the card-issuers' costs, the service will be cut back or eliminated. The result would be a decline in card use and a concomitant reduction in merchant-signing banks' revenues. In short, the cardholder cannot use his card unless the merchant accepts it and the merchant cannot accept the card unless the cardholder uses one. Hence, the IRF accompanies "the coordination of other productive or distributive efforts of the parties" that is "capable of increasing the integration's efficiency and no broader than required for that purpose." Bork, *The Rule of Reason and the Per Se Concept*, 75 Yale L.J. 373, 474 (1966); *see BMI*, 441 U.S. at 21, 99 S.Ct. at 1563, 60 L.Ed.2d at 17; *In Re UATP–1976*, 85–11 CAB at 2503. The IRF is "reasonably ancillary to [a] procompetitive, efficiency-creating endeavor[ ] and therefore not a naked restraint of trade." *Multi-List*, 629 F.2d at 1365. It is an internal accounting procedure between joint venturers that shifts a

---

**17.** NaBanco repeatedly stresses that each VISA member, not VISA, issues the individual plastic cards and receives all proceeds from individual transactions. Thus, VISA "produces" no true "product" according to NaBanco.

The VISA product, however, is not the plastic card itself, but the rules and regulations among the various VISA members that thereby create a

national payment system. This universal system is the true product of VISA; the plastic card merely embodies that product.

**18.** Significantly, NaBanco does not challenge any of the myriad other ancillary restraints that VISA imposes to create and protect its product. *NaBanco*, 596 F.Supp. at 1253.

portion of the revenues from the merchant-signing partner to the card-issuing partner. *See* Baxter Deposition, Vol. I, at 59–60. As such, it must be judged under the rule of reason.

We also note that NaBanco asserts that the IRF is invalid because it effects price fixing without procedural safeguards. The basis for this claim is that the VISA board of directors is alleged to act at their whim in setting the IRF without input or challenge from the merchant-signing members. This argument fails because the board is made up of members who both receive *and* pay the fee. The board can be, and actually has been, composed of members that handle more merchant accounts than cardholder business, and who therefore represent the solely merchant-signing members' interests because that interest coincides with their own. Given this relationship, the nature of the business ensures that one side will not unfairly take advantage of the other.

 In sum, we agree with the district court that in deciding whether a challenged practice is subject to rule of reason or per se analysis, the court must inquire into whether the practice, on its face, always or almost always tends to restrict output or instead is likely to assist the creation of economic efficiency. *NaBanco*, 596 F.Supp. at 1253. Rigid line-drawing must be avoided and close attention given to procompetitive, efficiency-creating integration that is accomplished as the result of an anticompetitive, yet ancillary, restraint. We conclude that the district court properly determined that the IRF was not a naked restraint of competition and therefore not per se price fixing proscribed by Section 1 of the Sherman Act.

Applying the rule of reason, the district court upheld the IRF on two separate and independent grounds. First, the court de-

termined that the relevant product market was all payment devices (including cash, checks, and all forms of credit cards) and that VISA did not possess power in that market. *NaBanco*, 596 F.Supp. at 1256–59. Second, the court found that, on balance, the interchange fee is procompetitive in nature, *id.* at 1259–61, and reasonably cost related. *Id.* at 1261–63.

NaBanco takes issue with the district court's findings on four fronts: (1) the IRF is anticompetitive; (2) market power is irrelevant in a price fixing case; (3) VISA has market power as demonstrated by the fact that its fixed fee denies merchant-signing banks the opportunity to compete effectively on equal terms; and (4) the district court drew from too large a relevant market by including all payment devices.

The rule of reason "condemn[s] every contract, combination or conspiracy which in purpose or likely effect will *significantly* restrict competition." L. Sullivan, *Antitrust Law* § 68, at 187 (1977) (emphasis in the original). Applying the rule of reason is a three step process. First, the court must determine the restraint's purpose. Second, the court must identify the likely effects of the restraint. Last, the court must balance the anticompetitive and procompetitive purposes and effects in an effort to ascertain if the restraint would substantially impede competition. *See id.* at 187–88.

Whether the court, in applying the rule of reason, must weigh the market power of the antitrust defendant is a curiously confused and uncertain area of the law. Cases can be cited for both sides of the proposition.[19] *NCAA* presents a particularly difficult and mystifying hybrid approach. "As a matter of law, the absence of proof of market power does not justify a naked restriction on price or output." *NCAA*, 468

---

**19.** *Compare Chicago Bd. of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918) (no market power analysis) *and* L. Sullivan, *Antitrust Law* § 69 at 190 (1977) ("perhaps in most" cases Supreme Court does not analyze market power) *with United States v. Container Corp. of America,* 393 U.S. 333, 89 S.Ct. 510, 21

L.Ed.2d 526 (1969) (Court analyzed possible market power) *and The Supreme Court, 1983 Term,* 98 Harv.L.Rev. 87, 255 (1984) (the Court "generally requires an inquiry into [the restraint's] nature and their actual effects on the market").

U.S. at ——, 104 S.Ct. at 2965, 82 L.Ed.2d at 89.

Even though the language in *NCAA* is somewhat cryptic, the Court apparently intended merely to require some competitive justification of certain restraints regardless of market power. *See The Supreme Court, 1983 Term*, 98 Harv.L.Rev. 87, 260–61 (1984). This case does not fall in a sufficiently similar fact pattern to warrant strict application of the *NCAA* language. Therefore, in analyzing the competitive advantages and disadvantages of the IRF, market power was a proper and useful tool for the district court.

Having decided that the relevant market is a valid analytic device in this setting, the issue is whether the district court improperly defined that market. The district court held that the relevant market was "all payment devices," and that VISA's share of that market—5 percent or less—did not constitute market power. *NaBanco*, 596 F.Supp. at 1256–59.

Initially, "[D]efinition of the relevant market is basically a fact question heavily dependent upon the special characteristics of the industry involved." *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 849 (5th Cir. 1975) (Section 2 monopolization case). The finder of fact normally is presented with voluminous expert testimony and other evidence. In such a situation, its factual findings are accorded great deference. We will not reverse the district court's market findings unless they are clearly erroneous. *See id.; Twin City Sportservice v. Charles O. Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir.1982) (market findings not disturbed unless clearly erroneous).

The trial court heard substantial evidence that VISA competes in a national market that includes all payment devices.[20] It also heard testimony that the other pay-ment devices were reasonably interchangeable with one another, even though not identical to a VISA card. "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336, 82 S.Ct. 1502, 1530, 8 L.Ed.2d 510, 542 (1962).

The district court's findings of fact concerning the relevant market are supported by substantial evidence and therefore not clearly erroneous. *See Anderson v. Bessemer City*, 470 U.S. ——, ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 528 (1985) ("If the district court's account of the facts is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it.... Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.... This is so even when the district court's findings ... are based on physical or documentary evidence or inferences from other facts."); *Dorsey v. Continental Casualty Co.*, 730 F.2d 675, 679 (11th Cir. 1984).

NaBanco challenges the district court's conclusion that the IRF had a net procompetitive effect and therefore is valid under the rule of reason. This claim of error is predicated on NaBanco's assertion that "the district court did not discuss the wealth of evidence establishing the actual anticompetitive effects of VISA's price fixing." Appellant's Brief on Appeal at 44.

In NaBanco's view, the primary anticompetitive effect ignored by the district court is that the IRF restricts competition between proprietary VISA members (those that both issue cards and sign merchants) and purely merchant-signing members. The proprietary members are free to reduce the merchant discount in "on-us" transactions, because they do not have to

---

**20.** This market includes VISA, Master Card, so-called "T & E" cards (travel and entertainment cards such as American Express and Carte Blanche), cash, travelers checks, personal checks, merchants' proprietary cards, ATM cards, and check guarantee cards.

NaBanco contends that the market must be defined from the perspective of the injured plaintiff. Appellant's Brief at 49. According to NaBanco the relevant market is credit card processing services. We do not reach this issue since the market in these particular circumstances is the same, whether viewed from the plaintiff's, defendant's, or consumer's perspective.

pay the IRF, and thus can undercut the purely merchant-signing institution that must keep its merchant discount higher than the IRF. Appellant's Brief on Appeal, at 44–46. NaBanco overlooks the court's findings that the IRF has competitive effects that create efficiencies.

The district court held that VISA introduced sufficient evidence to "establish[] that IRF is necessary to offer the VISA card—a pro-competitive benefit which offsets any anti-competitive effects." *NaBanco*, 596 F.Supp. at 1265. Evidence during the trial revealed that individual price negotiations are impractical, would produce instability and higher fees, and could result in the demise of the product offered. *See* Baxter Deposition, Vols. I & II; Baxter, *supra* note 13, at 586. The court found that viewing the evidence as a whole, VISA's evidence was more compelling on the competitive benefits created by the IRF. *NaBanco*, 596 F.Supp. at 1263. The "fundamental economic interdependence" between the card-issuing and merchant-signing banks, *id.* at 1260–61; Baxter, *supra* note 13, demonstrates that redistribution of revenues or costs is a must for the continued existence of the product.

The district court balanced the procompetitive and anticompetitive purposes and effects and decided that the restraint did not substantially impede competition. An abundance of evidence was submitted from which the district court plausibly and logically could conclude that the IRF on balance is procompetitive because it was necessary to achieve stability and thus ensure the one element vital to the survival of the VISA system—universality of acceptance. Substantial, plausible evidence also disclosed that VISA is a joint venture-type enterprise in which the IRF acts as an internal control mechanism that yields procompetitive efficiencies that its members could not create acting alone, and helps create a product that its members could not produce singly. As such, the district court's finding that the IRF is an ancillary restraint that is more procompetitive than anticompetitive is supported by substantial and persuasive evidence.

We hold that the district court's finding that the relevant market is all payment systems, and that VISA does not possess market power in that market, are not clearly erroneous. We also hold that the district court's alternative finding that, assuming VISA does have market power, the IRF is procompetitive is not clearly erroneous.

As a final matter, NaBanco objects to the fact that the trial was held in several segments over a period of a year and a half and claims it was prejudiced by this interrupted schedule. These pauses in the trial were necessary to accommodate the overloaded criminal docket in the Southern District of Florida, which cases must be given precedence under the Speedy Trial Act, 18 U.S.C. §§ 3161–74. NaBanco complains that this piecemeal process made presentation of its complex, technical evidence very difficult, thereby raising its burden of proof to an impermissible level.

In cases tried to a jury, delays and interruptions can rise to the level of reversible prejudice. *See Young & Simon, Inc. v. Merritt Savings & Loan, Inc.*, 672 F.2d 401, 402 (4th Cir.1982). This trial, however, was to the court without a jury. The trial judge's comprehensive opinion demonstrates detailed factual findings, well supported conclusions of law and a clear understanding of the case, record and the issues. *See Kenmitz v. United States*, 369 F.2d 389, 391 (7th Cir.1966). NaBanco can point to no errors of any consequence and makes no showing of prejudice resulting from the trial delays. Absent such a showing, there is no error of reversible magnitude.

The judgment of the district court is AFFIRMED.